# Exhibit A

**BEATTIE PADOVANO, LLC**
Ira E. Weiner, Esq. (015791976)
Daniel L. Steinhagen, Esq.
200 Market Street, Suite 401
Montvale, New Jersey 07645
Tel: (201) 573-1810

**STORZER & ASSOCIATES, P.C.**
Sieglinde K. Rath, Esq. (048131991)
9433 Common Brook Road,
Suite 208
Owings Mills, Maryland 21117
Tel: (202) 857-9766
Fax: (202) 315-3996

*Attorneys for Plaintiff, Passaic-Clifton Community Kollel Congregation, Inc.*

| | |
|---|---|
| PASSAIC-CLIFTON COMMUNITY KOLLEL CONGREGATION,<br><br>   *Plaintiff,*<br><br>*v.*<br><br>CITY OF CLIFTON ZONING BOARD OF ADJUSTMENT,<br><br>   *Defendant.* | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION<br>PASSAIC COUNTY<br><br>DOCKET NO.: PAS-L-1694-22<br><br>CIVIL ACTION<br><br>  **AMENDED COMPLAINT AND**<br>  **JURY TRIAL DEMAND** |

Plaintiff, PASSAIC-CLIFTON COMMUNITY KOLLEL CONGREGATION, INC.

located at 409-411 Main Avenue, Passaic, New Jersey, by way of Amended Complaint against

the Defendants, the CITY OF CLIFTON ZONING BOARD OF ADJUSTMENT located at 900

Clifton Avenue, Clifton, New Jersey and the CITY OF CLIFTON, NEW JERSEY located at 900

Clifton Avenue, Clifton, New Jersey, says:

**<u>NATURE OF ACTION</u>**

1

1.      This action is filed by Plaintiff, Passaic-Clifton Community Kollel Congregation ("Kollel" or "Plaintiff") to redress violations of its civil rights, as protected by the Free Exercise and Equal Protection Clauses of the United States Constitution, 42 U.S.C. § 1983, the Religious Land Use and Institutionalized Persons Act of 2000, et seq. ("RLUIPA"), and the New Jersey Law Against Discrimination caused by the Defendants' discriminatory and burdensome land use regulations and the application of those regulations that have prohibited and continue to prohibit Plaintiff from using its property located at 409-411 Main Avenue, Clifton, New Jersey as a place of worship that can accommodate its religious exercise.

2.      Plaintiff, who had previously been granted a use variance to use the property as a religious institution, applied to the City of Clifton Zoning Board of Adjustment ("ZBA") for bulk variances to allow it to construct a 370-square foot expansion of its existing use and to remove previously imposed conditions on its operations that burden its religious exercise.

3.      The ZBA, through the erroneous imposition and implementation of City of Clifton ("City") Zoning code ("Code"), denied Plaintiff's application, preventing Plaintiff from expanding its religious institution and from engaging in its religious exercise in accordance with its religious mission and beliefs.

4.      The ZBA classified Plaintiff's religious institution as a "Rabbinical Study Facility," which the Code does not permit anywhere in the City as a permitted or conditional use, while numerous nonreligious assembly and institutional uses may locate in the City as a permitted or conditional use.   As a result, Plaintiff's religious institution is restricted by conditions not placed upon other nonreligious assembly and institutional conditional uses in the City.

## A.  THE PARTIES

5.      Plaintiff Passaic-Clifton Community Kollel Congregation, Inc. is a domestic nonprofit corporation organized under the laws of the State of New Jersey in 2011.

6.      Plaintiff is the owner of property located at 409-411 Main Avenue, Clifton, New Jersey (the "Property").

7.      Defendant, City of Clifton, New Jersey is a municipal corporation of the State of New Jersey, having offices at 900 Clifton Avenue, Clifton, New Jersey ("City").

8.      Defendant, the City of Clifton Zoning Board of Adjustment is a duly authorized land-use board of the City of Clifton organized pursuant to *N.J.S.A.* 40:55D-69 for the purpose of exercising powers afforded to zoning boards of adjustment under the Municipal Land Use Law.

9.      Plaintiff is a religious assembly or institution as that term is used in 42 U.S.C. § 2000cc(b)(1).

10.     Each of these Defendants is a "government" within the meaning of 42 U.S.C. § 2000cc-5(4)(A).

## B.  PLAINTIFF'S RELIGIOUS EXERCISE

11.     Plaintiff is an Orthodox Jewish religious organization based in Clifton, New Jersey.

12.     Plaintiff's religious mission includes the advancement of the Orthodox Jewish faith and Rabbinical studies.

13.     In furtherance of its religious mission, Plaintiff owns and operates a *kollel,* which is a type of house of worship that includes Rabbinical study and prayer, with two attached dwellings, which are used to house rabbinic fellows and their families.

14.     It is Plaintiff's religious belief that it should provide religious education in the form of Talmudic study for Jewish scholars.

15.     Religious study is an essential form of worship in Plaintiff's faith.

16.     The Talmud is a 26-volume work comprised of the central core of the Torah's oral tradition, which was given to Moses at Mount Sinai along with the tablets containing the Decalogue.  The sages completed the Babylonian Talmud over 2000 years ago, after being exiled from Jerusalem following the destruction of the Temple.  The Talmud is a compilation of legal, historical and ethical case studies and didactic texts, and is written in a combination of ancient Aramaic and Hebrew.

17.     Studied over the centuries, Jews have built upon this foundation of traditional wisdom over the course of the Diaspora, and thousands of companion volumes have been authored to elucidate and elaborate upon these ancient texts.

18.     The study of Talmud is complex and demanding.  A Talmudic scholar, known as a *Talmid chacham,* is an expert in the entire Babylonian Talmud both the text and its commentaries.  The goal of becoming a *Talmid chacham* is a lifelong endeavor, avidly pursued by serious students for decades.

19.     Serious Talmudic scholars who seek to master the basic Babylonian Talmud and its commentaries typically commit two or more decades of intensive analysis to studying its 63 Tractates.  Each Tractate consists of a unique set of laws, and often a unique syntax and style of analysis.

20.     There are approximately 13 fellows studying at the Kollel at any given time with an age between 25 and 35.  They are all male and are all married.

21.     The fellows usually stay for a period of five to seven years.

22.     The students generally live within a mile of the property and often walk to the Kollel.

23.     Fellows receive a stipend, study religious text, pray in conjunction with their studies, and conduct their studies as a method of worship.

24.     Central to Orthodox Judaism is also prayer multiple times per day.

25.     In conjunction with studying, the Rabbiand rabbinical fellows pray at the Kollel in accordance with their religious beliefs.

26.     As study is a central part of the Kollel's worship along with prayer, the current structure is a house of worship in accordance with Plaintiff's religious beliefs.

27.     The current Kollel is too small to meet the needs of the Kollel and its fellows.

28.     As part of Plaintiff's religious exercise, students study in pairs in which they discuss religious texts. *Chavrusa* is a traditional rabbinic approach to Talmudic study in which students, studying in pairs, analyze, discuss, and debate a shared text. *Chavrusa* is a primary learning method in *kollels*, in which students study with partners of similar knowledge and ability.

29.     The current Kollel does not have enough space for pairs of students to discuss religious texts without disturbing other students, and without being disturbed by nearby discussions.

30.     As part of Plaintiff's religious exercise, small groups of rabbinical fellows practice teaching model classes.

31.     The current Kollel does not have enough space for multiple classes to take place at the same time without significant disruption.  As a result, fellows have had to teach model lessons to other participants in the coatroom while all are standing.

32.     The current Kollel does not have space for students to take examinations in a quiet location.

5

33.     A Rabbinical library is an integral part of the Kollel, with some *kollels* having 30,000 to 40,000 books.

34.     The Kollel currently has approximately 7,000 books, but they require a library of at least 20,000 books.

35.     The current facility does not have space for a library with 20,000 books.

36.     The current facility does not have space for pastoral counseling.

37.     The current facility does not have an office for the rabbi. The Rabbi uses the parking lot to make phone calls and meet individually with students.

38.     Currently, the Kollel is restricted by a ZBA Resolution from 2017 which restricts the hours in which it may operate.

39.     Because of conditions imposed by the City, as discussed below, the Kollel is only permitted to operate between the hours of 9:15 a.m. and 1:15 p.m., and 2:00 p.m. and 6:15 p.m.

40.     Orthodox Jews must pray three times per day: in the morning, afternoon and evening, according to Jewish law.

41.     It is not possible for the Rabbi and fellows to pray at the *halachically* (as required by Jewish law) times throughout the day at the Kollel, in conjunction with their Talmudic studies, with the current restrictions on hours of operation.

42.     The Kollel has a need to operate outside of the "permitted" hours so that Kollel members can pray and study in accordance with their religious beliefs.

43.     The Kollel's current structure is insufficient to meet the religious needs of the Rabbi and rabbinical fellows.

44.     The Rabbi and rabbinical fellows are unable to engage in religious exercise in

6

accordance with their religious beliefs in the current structure.

## C.  THE PROPERTY

45.      The Property is located at Block 59.03, Lot 17 on the Tax Map of the City of Clifton.

46.      The Property is located on Main Avenue, a busy thoroughfare which runs through the downtown area of the City and is lined with many commercial uses.  Main Avenue ends at State Route 3 less than 1 mile (0.7 mile) from the Property.

47.      The Property is located in the B-B Neighborhood Retail Business Zone.

48.      Within a half-mile radius of the Property are various nonreligious and religious assembly, institutional, industrial, residential, commercial and retail land uses, including the LJDJs Event Design and Entertainment (DJ service, 95 feet from the Property), the Rock Bar & Grill (restaurant and bar, 150 feet from the Property), Daniellas Shop (clothing store, 213 feet from the Property), Rapid Lube (automotive repair shop, 387 feet from the Property), VMV Cosmetic Group (cosmetics supplier, 400 feet from the Property), Artistic Monument Co (monument company, 0.2 mile from the Property), Parkview Animal Hospital (animal hospital, 0.2 mile from the Property), VIP (massage therapy, 0.2 mile from the Property), Daddy and Kinder Cuts (barber shop, 0.2 mile from the Property), Evergreen at Clifton (condominium complex, 0.2 mile from the Property), Hatzalah of Passaic Garage (volunteer organization, 0.4 mile from the Property), Brook Haven Mall (shopping mall, 0.4 mile from the Property), Aisle One Kosher (supermarket, 0.4 mile from the Property), Yudin's Appliances (appliance store, 0.4 mile from the Property), and K-D Industries (machine shop, 0.5 mile from the Property).

49.      Across the street from the Property is the Rock Bar and Grill, which includes an

indoor and outdoor seating area where food and alcohol are served and music is played.  The Rock Bar and Grill is open until 3:00 a.m. daily.

50.       Within a mile radius of the Property are various other land uses, including Falstrom (sheet metal contractor, 0.6 mile from the Property), Ooka Sushi Hibachi Lounge (restaurant, 0.6 mile from the Property), Clifton Fire Station 4 (fire station, 0.6 mile from the Property), Tele-Measurements (telecommunications service provider, 0.7 mile from the Property), Homeless Animal Adoption League, Inc. (animal shelter, 0.8 mile from the Property), Hemingway Government Offices (city government office, 0.8 mile from the Property), St. Clare Roman Catholic Church (Catholic church, 0.9 mile from the Property), Costco Wholesale (membership warehouse club, 0.9 mile from the Property), and River Front Center (shopping mall, 0.9 mile from the Property).

### D.  2017 APPLICATION

51.       On December 28, 2016, Plaintiff applied to the ZBA to use the Property for religious study and worship.

52.       Three hearings were held on the Application on March 15, 2017, April 19, 2017 and May 3, 2017.

53.       Hostility against Orthodox Jews exists on the part of the government and residents of the City.

54.       The City has been responsive to local residents' hostility toward Orthodox Jews.

55.       Comments from objectors at the April 19, 2017 hearing include:

a. "Are you going to start taking students from Lakewood, from Monsey, from Teaneck?"  Lakewood, Monsey and Teaneck all have significant Orthodox

Jewish populations.

b. "[H]ow do we confirm that there are only 15 students in the building?. . . How do we -- do we trust you?"

c. "Now you have two bathrooms. . . and one is a ladies room. . . . Why would you need a ladies room."

d. "Since this is . . . a rabbinical study, can you point to the law that would say you would need two bathrooms?"

e. "Will there be praying here?" and "[p]lease tell me the times you will be praying?" and "so you'll only pray for 16 minutes?"

f. "[H]ow will anyone be able to police [the hours of operation]."

g. To the Rabbi, "define religious activities."

h. "I think that if the Board looks favorably on this application, I think you need to be very specific to put in that there will be no children during the hours."

i. "So -- so -- so in other words we have nothing other than the Rabbi's word --"

j. "And we've heard this nonsense about, well, everybody walks, everybody doesn't park."

k. "[T]he people of Delawanna have heard this song before, that everything is going to be great.  And it never is.  We can't police it.  It's never great."

56.     Instead of considering Plaintiff's use to be one of the various educational, institutional or religious uses enumerated within its zoning code, the ZBA described Plaintiff's use as a new land use category, "Rabbinical Study Facility."  That use is not a permitted or conditional use anywhere in the City.  Clifton, N.J., Code ch. 461, art. IV, § 461-13.1 (2023).

57.     At the conclusion of the hearings, the ZBA issued a resolution ("2017

9

Resolution") granting a use variance for a "Rabbinical Study Facility" and variances for parking spaces and lot coverage, subject to an unprecedented list of conditions including:

    A.  That the premises is not a school;

    B.  The hours of operation will be from 9:15 a.m. to 1:15 p.m. and 2 p.m. to 6:15 p.m.;

    C.  No one shall be at the premises before 9 a.m. and after 6:30 p.m.;

    D.  There shall be no more than 13 participants, plus the Rabbi;

    E.  There will be no social events at the site; and

    F.  There will be no food served at the site;

58.    Another condition imposed by the ZBA was that "[t]he garbage must be collected in accordance with the Clifton Ordinance," as if the Rabbi would not comply with the Clifton Ordinance regarding garbage.

59.    There are no facts in the record to support the ZBA's conclusion that the conditions imposed were reasonably necessary to protect the character of the neighborhood.

60.    The other uses located in the vicinity of the Property are significantly more intensive than Plaintiff's use and have none of the conditions that were imposed on Plaintiff's use.

61.    In the 2017 Resolution, the ZBA's factual findings include:

    A.  The use is inherently beneficial.

    B.  The applicant has satisfied the positive criteria since the use is inherently beneficial.

    C.  The proposed use is less intense than the previous use at the site <u>and any other uses permitted in the zone</u>.

D. The applicant has shown sufficient hardship to justify the grant of the bulk variances requested.

E. The benefits of the application outweigh the detriments, if any.

F. The proposed use will be in accord with the intent and purpose of the master plan ordinance since it is an inherently beneficial use.

## E.  2022 APPLICATION

62.      In 2022, Plaintiff sought approval for a modest expansion to the current structure to accommodate its religious exercise, a lifting of the restrictions on hours of operation to accommodate its religious exercise and the correction of an erroneous interpretation of law made by the ZBA in 2017.

63.      Several months prior to filing an application in 2022, Plaintiff filed an application ("2021 Application") seeking to expand the Kollel for its religious exercise.

64.      At the hearing on the 2021 Application, the Rabbi testified that the Kollel is a house of worship.

65.      At the hearing on the 2021 Application, the Zoning officer admitted that the City arranged for inspectors to go to the Property "and sit and watch every other day for a week to see who goes in and out" in response to complaints from residents about the Kollel.

66.      At the hearing on the 2021 Application, the Chairman stated: "I would love to see you buy another building somewhere and build. . . because this just -- just doesn't work here."

67.      Because Plaintiff received negative feedback from the ZBA on the 2021 Application at the hearing, Plaintiff withdrew the 2021 Application, revised its plans as suggested by the ZBA, and reapplied in 2022.

68.     On or about February 28, 2022, Plaintiff submitted an Application ("2022 Application") to the ZBA requesting a variance to convert the first floor of the dwelling for use as part of the *kollel*, to add a small addition to the front of the building and to lift the restrictions on hours of operation.

69.     The 2022 Application proposed a 370-square foot addition to the front of the structure.  No change in use was proposed in the Application.

70.     In the 2022 Application, Plaintiff also sought to extend the hours of operation beyond those imposed by the 2017 Resolution, so that they could engage in prayer and study outside of the prescribed hours in accordance with their religious beliefs.

71.     The proposed project included a library, office, private areas for meetings and test taking, and an expansion of the sanctuary and study areas, which are necessary for Plaintiff's religious exercise.

72.     Plaintiff applied for a front-yard setback variance for 12.7 feet.  Because the front-yard setback is currently 16.3 feet, Plaintiff was only requesting a variance for an additional 3.6 feet.

73.     Plaintiff indicated that the Kollel would not increase its enrollment.

74.     On May 18, 2022, the ZBA held a hearing on the 2022 Application.

75.     Objectors at the hearing expressed opposition to the removal of restrictions on the hours of operation due to concern over "noise."

76.     The purpose of removing the restrictions on the hours of operation was to allow for prayer at various times in accordance with the Plaintiff's religious beliefs.

77.     All prayer occurs indoors at the Kollel.

78.     The prayer that takes place inside of the Kollel cannot be heard beyond the

Property's borders.

79.     The Kollel is on Main Avenue in close proximity to a bar, gas station, factory and school with over 1,000 children that opens early in the morning.

80.     When individuals pray inside of the Kollel, no one outside of the Property can hear their prayers.

81.     The hearing for Plaintiff's 2022 Application was rife with improper comments displaying thinly veiled anti-Semitic sentiments, and comments suggesting that Plaintiff should engage in religious exercise in a manner different than what their religious traditions and beliefs require.

82.     Comments from the May 18, 2022 hearing include:

a. From the Vice Chairman: "[F]rom what I hear is neighbors saying you came here for a variance and you haven't been following the rules. And what he's asking us to try to understand is how does he know now with this expanding this, if the rules are going to be followed."

b. From the Chairman: "I'm just looking at it and I'm saying for 13 people or 14 people, you know, 1150 square feet of prayer, I would think that's more that than [sic] sufficient enough whether there's the nine-I'm just trying to like-I keep looking at-"

c. From the Chairman: "So, like the other Kollels, they're smaller, I assume, because they don't do what yours does, correct? Is that the reasoning, right?"

d. From a commissioner: "So they're not therapists, they're just, I guess, religious counselors?"

e. From the Chairman: "[H]e's got all this room now to put his books and to do

study. Why even go [sic] to this point if it's minute?"

f. From the Chairman regarding the Kollel's need for additional space for religious exercise:  "Yeah, listen, they have their opinions, I get it.  I mean, I have my opinion."

g. From a commissioner regarding the Kollel's need for additional space for religious exercise:  "I don't want to hear more testimony, it's late already."

83.     After the Rabbi testified at length about the need for additional space for religious purposes, a commissioner asked "Are there any students that can testify to the need of additional space or how study works?  I just -- I study in the morning. I -- I have books. I'm not a full-time student, but maybe there's a student or somebody that can give us some more insight into how this space will help."  The Kollel attorney responded: "I can't think of anybody who can give more expert opinion than the Rabbi, and he's done so."

84.     After the Rabbi testified at length about the Kollel's need for additional space for their religious exercise, the Board Planner commented: "I think if the Rabbi speaks, he has to make a clear statement why 1450 square feet is needed in lieu of the 1150 that's existing floor space. We need to know why–why that extra 300 square feet" and: "I think, you know, now that it's a concern, I think if he could justify the reasons a little bit more clearly, it might provide some clarity."

85.     The Rabbi had to testify again regarding the addition and the faith-driven layout of the inside of the Kollel.

86.     A fellow at the Kollel also testified about the need for distance between the fellows at the Kollel.

87.     An Objector stated: "I personally think he outgrew it."

88.     In a resolution of the ZBA ("2022 Resolution"), the ZBA disapproved Plaintiff's Application and denied the requested relief.

89.     The following statements were made by various Commissioners in voting no to the application:

a.  "I believe that they could spread themselves out into the existing space they have."

b.  "I have to say my biggest concern is . . . you just might have outgrown this space."

c.  "370 feet, to me, that's too much. . . . They have enough room without that addition."

d.  "I think I'm hearing that we have a consensus that it is an inherently beneficial use and it is definitely beneficial to the community. However, based on what we heard the activity appears to have a negative impact on the quality of life…. One of the objectors -- or one of the supporters talked about growth of the neighborhood, growth of the community, and that's all wonderful, but we can't just have growth at any price."

e.  "They have enough room without that addition. . . . he still has his rabbinical study."

90.     In denying the 2022 Application, the ZBA stated in the 2022 Resolution that "[t]he Board finds credible the testimony concerning noise at the site," despite the use being for religious study and worship in which the Rabbiand fellows engage in quiet prayer and study.

91.     The Kollel's professional testified that the "activity that takes place within the building is a quiet religious prayer type of activity."

92.      No prayers from inside of the facility can be heard outside of the Property.

93.      The proposed expansion would not impact the noise level at the Property as the same use would continue.

94.      In contrast to the Kollel, there is significant noise generated by other commercial uses in the vicinity of the Property such as a bar across the street, which serves alcohol until 3:00 a.m. and has outdoor seating for food and drink.

95.      In the 2022 Resolution, the ZBA stated that "[t]he site is not suitable for a front addition since applicant is utilizing the first floor of the structure which was a residence and could easily utilize the second floor of said structure if there is a need for additional space" yet Plaintiff's religious exercise requires the expansion to take place on the first floor where the sanctuary is located and where the Rabbi and fellows worship.

96.      In the 2022 Resolution, the ZBA stated that "[t]he applicant has shown no special reasons to justify the expansion of the facility into the front yard setback,'' even though the Rabbi testified at length about his need for more space to accommodate the Kollel's religious exercise.

97.      In the 2022 Resolution, the ZBA stated that the proposed expansion "does not satisfy the positive criteria for the grant of a use variance" even though the ZBA found that Plaintiff satisfied the positive criteria in 2017 since the use is inherently beneficial.  The use had not changed since 2017.

98.      The Kollel is an inherently beneficial use under New Jersey law.

99.      In the 2022 Resolution, the ZBA stated that "[t]he applicant has shown no hardship to justify the grant of the 'c' variances requested," even though the ZBA found "sufficient hardship" to justify the grant of the bulk variances in 2017.

100.     In the 2022 Resolution, the ZBA stated that "the Board finds from the testimony presented that the proposed front yard setback variance for the 370 square foot front addition will not be in accord with the intent and purpose of the master plan and zone ordinance due to the objections raised by the objectors," yet made no findings of fact to support this conclusion.

101.     In the 2022 Resolution, the ZBA stated that "the lack of sufficient parking and the location of the proposed front addition at the site may be detrimental to the health, safety, and general welfare of the neighborhood" yet made no findings identifying any detriments to the health, safety and general welfare of the neighborhood.

102.     In the 2022 Resolution, the Board found that in addition to the front yard setback variance, Plaintiff would also require a building height variance, parking area setback variance, parking stall variance and a parking space variance, which were also denied.

103.     The height of the proposed expansion is less than 18 feet at its maximum which is less than the maximum height required for the B-B Zone.

104.     The existing parking setback and stall size were approved in the 2017 Resolution.

105.     A variance for the number of parking spaces was granted in the 2017 Resolution, and no further parking spaces are required by the proposal.

106.     The ZBA's requirement that Plaintiff prove additional variances for building height, parking area setback, parking stall size, and number of parking spaces was arbitrary.

107.     The use of the property that was approved in 2017 had not changed.

108.     The factual findings that the Board made in 2017 still apply, but were ignored by the ZBA: that the use is inherently beneficial; that the applicant has satisfied the positive

17

criteria since the use is inherently beneficial; that the proposed use is less intense than the previous use at the site and any other uses permitted in the zone; that the applicant has shown sufficient hardship to justify the grant of the bulk variances requested; that the benefits of the application outweigh the detriments, if any; and that the proposed use will be in accord with the intent and purpose of the master plan ordinance since it is an inherently beneficial use.

109.    The ZBA treated the Kollel as a mixed-use building since the building contains two attached dwellings in addition to the *kollel*, but the dwellings are not a separate use.  The dwellings are a religious use, accessory to the main use of the *kollel*.

110.    The dwellings are exclusively occupied by rabbinical fellows who study at the Kollel and their families, and are not available for rent by the general public.

111.    The dwellings are tax exempt as religious housing.

112.    The ZBA determined that a "d" variance, which is a use variance, was required based on the erroneous classification of the structure as a mixed-use building.

113.    The ZBA also ignored the fact that it granted a use variance to the Kollel for its property in 2017, requiring the Kollel to seek a use variance again in 2022 for the same use.

114.    A "c" variance requires four votes for approval under the governing statute.

115.    A "d" variance or use variance requires five votes for approval.

116.    A majority of the Board, four members, voted to approve the application, even with the use variance, but the application was deemed denied because it did not receive five votes.

117.    The ZBA members who voted in favor of the application referenced the character of the surrounding neighborhood, particularly the nearby bar and its hours of operation, and confirmed that the use was no more intense or detrimental to the neighborhood than any of

the other current uses.

118.    Only three ZBA members voted against Plaintiff's application.

119.    The ZBA's interpretation of the number of votes needed to approve the application is arbitrary, capricious and unreasonable because it plainly contravenes the governing statute and precedent establishing that a use variance runs with the land, and once granted, the property is deemed suitable for the use, such that the use is not a nonconformity.

120.    A second use variance was not required absent a change of use that would have required a use variance on its own.  Here, there was no change of use, and only four votes were required for approval of the "c" variances in question.

121.    Since the application received four votes, the Board's erroneous legal determination was the sole cause for the denial of the application.

122.    The Kollel use would have promoted Goals 8 and 13 of the City Master Plan, which are:

> Goal 8: To promote the revitalization and enhancement of the Main Avenue corridor as a unified, pedestrian-friendly downtown business district for the community.
>
> Goal 13: To enhance community appearance and the visual environment by encouraging good design for new and rehabilitated buildings.

123.    The ZBA imposed arbitrary requirements on Plaintiff's use, and the proposed expansion, which is less intense than the commercial uses permitted in the B-B Zone.  For example, located directly across Main Avenue is a restaurant and bar that was allowed to construct an outdoor seating area within the last two years where food and alcohol are served and music is played. The bar is open until 3:00 a.m. every day.

124.    The ZBA determined, without evidence, that the Plaintiff's use and proposed expansion generated excessive noise, even though permitted uses in the zone and the existing

commercial uses in the vicinity of the Property generate greater noise.

125.    The ZBA determined, without evidence, that the proposed 12.7-foot front yard setback excessively obstructed views even though many existing structures in the vicinity of the Property have less or no front yard setback and one neighboring property has the same or similar setback.

126.    The ZBA discriminated against Plaintiff by refusing to grant relief from prior conditions limiting hours of operation, even though the regulations governing the B-B Zone do not restrict hours of operation or impose temporal occupancy restrictions on commercial uses.

127.    The existing commercial uses in the vicinity of the Property are permitted to operate during periods when Plaintiff is not permitted.

128.    Kollel is entitled to relief reversing the ZBA's denial of the 2022 Application.

## F.  THE CITY'S LAND USE REGULATIONS

129.    The use of the Property is subject to the laws and regulations of the City and the State of New Jersey.

130.    The City regulates zoning within its borders through Chapter 461 entitled "Zoning" of the City Code ("Code").

131.    The Code sections described herein are "land use regulations" within the meaning of 42 U.S.C. § 2000cc-5(5).

132.    The primary activities that take place in the Kollel are religious study and prayer.

133.    Plaintiff's use was determined by the ZBA to be a "Rabbinical Study Facility" land use.

134.    A "Rabbinical Study Facility" land use is not a permitted land use anywhere in the City.

135.    A "Rabbinical Study Facility" use is not a conditional use anywhere in the City.

136.    Pursuant to Section 461-13.1A(1)(b) and (c) of the City Code, the following nonreligious assembly and institutional uses are permitted in any district:

      a. Public parks and playgrounds together with recreational, administrative and service buildings appurtenant thereto.

      b. Uses of land and erection of buildings by the City of Clifton for governmental purposes, not to include municipal uses which are proprietary in nature and function.

137.    Pursuant to Section 461-13.1J, permitted uses within the B-B zoning district include drug and stationary stores, bakeries, liquor stores, barber shops, hardware stores, grocery stores, offices, and other commercial uses of a retail nature.

138.    The following nonreligious assembly and institutional uses are also permitted uses in the City: theaters, senior citizen housing, hotels and conference centers, day-care facilities, business or training schools, indoor recreation centers, including health and fitness clubs, and municipal recreation facilities.

139.    The following nonreligious assembly and institutional uses are conditional uses in the B-B zoning district: meeting halls and clubs, nursery schools, hospitals, business schools, restaurants and retail or commercial uses involving a drive-in facility.

140.    The following nonreligious assembly and institutional uses are also conditional uses in the City: schools, senior citizen housing, meeting halls and clubs for nonprofit veterans' associations, fraternal organizations, lodges, social and charitable organizations, hospitals, and

assisted living facilities.

141.    The Code does not provide a regulatory purpose for its zoning scheme or for any of the zones classified therein.

142.    Because Plaintiff's use, as determined by the City to be a "Rabbinical Study Facility," is not permitted anywhere within the City, Plaintiff was required to obtain a use variance under New Jersey law. N.J.S.A. 40:55D-70(c) to (d).

143.    Plaintiff was granted a use variance by the ZBA in 2017 to operate a "Rabbinical Study Facility" in the B-B zone.

144.    Given the ZBA's broad discretionary powers to limit and condition a use variance, in 2017 it imposed substantial restrictions on Plaintiff's religious exercise, restrictions that have only become more burdensome to Plaintiff in recent years.

145.    The restrictions on Plaintiff's use imposed by the ZBA include:

    A.  Plaintiff's hours of operation were limited to between 9:15 a.m. and 1:15 p.m., and between 2:00 p.m. and 6:15 p.m.;

    B.  Plaintiff was prohibited from having anyone on the premises before 9 a.m. and after 6:30 p.m.;

    C.  Plaintiff was prohibited from having more than thirteen participants, plus the Rabbi;

    D.  Plaintiff was prohibited from having social events at the site; and

    E. Plaintiff was prohibited from serving food at the site;

146.    If Plaintiff's use were permitted in the City, like many other nonreligious assembly and institutional land uses, it would not have been subject to such onerous limitations on its use.

147.     Additionally, other specific nonreligious assembly and institutional uses have been granted in the City, including in the B-B zone, without the conditions that were imposed on Plaintiff's *kollel.*

148.     Other nonreligious institutional and assembly uses in the City and in the B-B zone may operate without restrictions on hours of operation.

149.     Other nonreligious institutional and assembly uses in the City and in the B-B zone were approved without restrictions on occupancy.

150.     Other nonreligious institutional and assembly uses in the City and in the B-B zone have no restrictions on social events at the site.

151.     Other nonreligious institutional and assembly uses in the City and in the B-B zone have no restrictions on the serving of food at the site.

152.     For example, and without limitation, the following assemblies or institutions are not subject to the same restrictions imposed by the ZBA on Plaintiff:

a.   Clifton public schools;

b.   Clifton Day Care, located at 11 Brighton Road, in the B-C Zoning District.

c.   Lightbridge Academy, located at 1096 Route 46, in the B-D Zoning District;

d.   VFW Post 7165, located at 491 Valley Road, in the RA3 Zoning district;

e.   Clifton Masonic Lodge #203, Located 1484 Van Houen Avenue, in the RA3 Zoning District;

f.   The Clifton Little School, a childcare facility, located at 393 Broad Street, in the B-B Zoning District;

g.   Cathy Fierro's School of Dance, located at 139 Valley Road, in the B-B Zoning District.

153.  Plaintiff's *kollel* is subject to restrictions that other assembly and institutional uses are not subject to.

154.  The conditions imposed on Plaintiff's use, which are not imposed on other uses in the City, violate RLUIPA's Equal Terms provision.

155.  The City land use regulations totally exclude "Rabbinical Study Facilities" from its jurisdiction in violation of the RLUIPA's exclusion and limits provision.

## G.  ANTI-SEMITIC HOSTILITY IN CLIFTON

156.  The City's denial of Plaintiff's application for a Kollel that could accommodate its religious exercise took place against a backdrop of anti-Semitic hostility in the City and opposition to Plaintiff's use as an Orthodox Jewish facility.

157.  On June 21, 2023, picnic benches, trees and a door to a portable toilet in Dunney Park (located adjacent to the Mesivta of Clifton) were defaced with swastikas.

158.  This year, anti-Semitic graffiti appeared three times at the bus stop by the Allwood Road Park & Ride and on the walkway at Jubilee Park.

159.  A Facebook group, "Clifton Citizens Concerns" published posts that included:

a. "Some people are just pigs can you imagine what there [sic] house looks and smells like.  Most likely that rent or maybe own.  These people are just lazy filthy disgusting animals. There where [sic] supposed to build a dog park.  But think the Jews stopped it.  The Delawanna section has really gone to shit sense [sic] they started coming in we have to change the garbage day because of there [sic] sabbath. These people actually be hate to them self [sic]. Because of who they think they are. They have no respect for anyone other than a Jew. There [sic] kids are like wild animals totally disrespectful little brats and the

parents let them run a muck [sic]. Now I hope you don't think I'm racist because I'm not. I have a lot of Jew friends. And tell them the same thing it's called a op…Opinion."

b. "It is a scam to avoid paying higher property taxes and just think of the money the city is loosing [sic]?"

c. "[T]hank you Mary for letting us know that we're getting used and abused and seems to be certain kind of person that does this it's like they were chosen."

d. "[Y]ou're absolutely right all these houses with temporary CO should all be checked out we all know where there [sic] and who they are but yet it's been going on for years. What really pisses me off is all the houses residential houses claim to be a house of worship I don't think they're paying taxes at all. Some people are very seeking. They will just keep taking and taking as long as they can get away with it. And we all know who they are."

e. "Where the hell do these people come from pushing something so ridiculous! In my opinion, if we didn't have a city council where all members were 'at large' this may not have happened since there would be no fear of a bullet vote coming out of a certain community."

f. "The 'bullet votes' from Roasmawr is why this sidewalk travesty is happening."

160.    The City has treated the Plaintiff's religious land use on less than equal terms as other nonreligious institutional and assembly uses.

161.    Defendants' laws and actions discriminate against Plaintiff on the basis of religion and religious denomination.

162.  The ZBA's denial of Plaintiff's 2022 Application caused a hardship that substantially affects Plaintiff's right of religious exercise.

163.  The ZBA's denial of Plaintiff's 2022 Application imposes a substantial burden on Plaintiff's religious exercise.

164.  The ZBA possesses no compelling interest that justifies the denial of Plaintiff's application.

165.  Denial of Plaintiff's application is not the least restrictive means of achieving any governmental interest.

166.  Denial of Plaintiff's application is not narrowly tailored to achieve any governmental interest.

167.  The Defendants' actions described above all took place under color of state law.

168.  Plaintiff has suffered significant damages as a result of the Defendants' actions.

169.  The ZBA's denial of Plaintiff's application is arbitrary, capricious and unreasonable.

170.  The ZBA's denial of Plaintiff's application prevents Plaintiff from engaging in its religious exercise in accordance with its religious beliefs.

171.  The construction of the Plaintiff's proposed project, at an estimated cost of $1,000,000.00 (one million), would affect interstate commerce.

172.  The construction's effect on interstate commerce would result from, amongst other things, Plaintiff's fundraising activities related to the construction; the transfer of funds to those it engages for construction; the engagement of construction companies; the employment of and payments to construction workers either by Plaintiff or by companies engaged by it; the purchase of necessary materials; the use of interstate highways for the transportation of persons

and materials used in construction; the use of interstate communication related to construction; and other activities related to the construction.

173. The operation subsequent to construction of the project would affect interstate commerce, by or through, amongst other things, serving as a site for ongoing fundraising; its receipt of charitable donations from persons working or living outside of the State of New Jersey; the use of means of interstate communication to facilitate the project's ongoing operations; the use of interstate travel related to the project's ongoing operations; and the purchase of goods and services related to the project's ongoing operations and maintenance.

## COUNT ONE

174. Paragraphs 1 through 173 are incorporated by reference as if set forth fully herein.

175. Plaintiff's challenge to the denial of its Application is timely pursuant to *R.* 4:69-6.

176. The use of the Property for worship and rabbinical studies is not a non-conforming use.

177. The use of the Property for rabbinical studies was permitted by variance upon the adoption of the prior resolution in 2017.

178. Prior to submission of the application, the ZBA, through its Planner, advised Plaintiff it was required to seek a "d" variance under N.J.S.A. 40:55D-70(d).

179. Because the proposed use was previously approved by the ZBA, Plaintiff was not required to seek a "d" variance, as established in Puleio v. North Brunswick Township Board of Adjustment, 375 N.J. Super. 613 (App. Div. 2015).

180. Plaintiff was merely required to submit proofs to the ZBA sufficient to obtain a "c" variance under N.J.S.A. 40:55D-70(c).

181.     Additionally, the ZBA erroneously treated the *kollel* and attached dwelling as a mixed-use building requiring a "d" variance when the *kollel* and dwellings were both religious uses, with the dwellings, which housed rabbinical fellows, as an accessory to the *kollel*.

182.     The ZBA improperly treated the Application as a "d" variance, erroneously requiring five affirmative votes for approval.

183.     The Application should have only required four affirmative votes for approval.

184.     Four members of the ZBA voted in favor of Plaintiff's Application, and therefore approval should have been granted.

## COUNT TWO

185.     Paragraphs 1 through 184 are incorporated by reference as if set forth fully herein.

186.     Plaintiff submitted sufficient proofs to qualify for a variance pursuant to *N.J.S.A.* 40:55D-70(c).

187.     The proposed variances are necessary for continuing the use at the Property.

188.     The proposed variances advance the purposes of the Municipal Land Use Law, as recognized by the Board in the 2017 Resolution.

189.     The benefits of the proposed variances substantially outweigh any resulting detriments caused by the proposed variances.

190.     Plaintiff satisfied the positive and negative criteria for all the variances it required.

191.     Plaintiff satisfied the requirements for any design exceptions or waivers required for the site plan.

192.     Plaintiff demonstrated that the Property could be developed in a safe and efficient manner in accordance with the requirements of the Clifton site-plan ordinance.

193.     The ZBA did not have a credible basis to support its decision to deny the Application and instead relied upon unsubstantiated allegations of excessive noise and obstruction of view.

194.     The same use and activity will continue on the Property, and therefore the amount of noise generated at the Property, which is already minimal, will not change.

195.     The proposed expansion will continue to allow for noise to be contained within the structure.

196.     Reliance by the ZBA on noise generated by the ingress and egress of vehicles to and from the Property is arbitrary and unreasonable because Main Avenue already generates a significant amount of commercial traffic, which is an existing source of noise, regardless of the use occurring at the Property.

197.     There is significant noise generated by other commercial uses on Main Avenue in the vicinity of the Property.

198.     There are no noteworthy landmarks or significant views located on Main Avenue in the vicinity of the Property and the proposal is no closer to the front-yard property line and would be less nonconforming than other properties in the zone along Main Avenue.

199.     The structures on the neighboring lots also infringe on the front yard setbacks, so the existing views from those properties will not be obstructed to any greater degree than the degree to which the neighboring structures obstruct views from the Property.

200.     The ZBA did not rely on any sound analysis or sightline calculations in determining that the Property would generate excess noise or excessively obstruct the view.

201.     The ZBA did not offer any factual basis for refusing to grant relief from the prior conditions limiting Plaintiff's hours of operation.

202.    The ZBA's denial of the requested variances and relief from prior conditions was arbitrary, capricious and unreasonable.

## COUNT THREE

203.    Paragraphs 1 through 202 are incorporated by reference as if set forth fully herein.

204.    The ZBA improperly required Plaintiff to prove variances for building height, parking area setback, parking stall size, and number of parking spaces.

205.    The height of the proposed expansion does not exceed the maximum height regulation for the B-B Zone, and even if it did, only a "c" variance would have been required.

206.    Plaintiff has not proposed a change in the existing parking setback and stall size which was approved in the 2017 Resolution.

207.    Plaintiff demonstrated that there were sufficient existing off-street parking spaces to accommodate the Property's parking needs.

208.    The existing off-street parking at the Property is greater than the amount of off-street parking offered by other commercial uses in the vicinity of the Property.

209.    The ZBA acted beyond the scope of its authority by imposing an arbitrary parking standard.

210.    The ZBA granted a variance for the number of parking spaces in the 2017 Resolution, and no further parking spaces will be required by the proposal.

211.    The ZBA's requirement that Plaintiff prove additional variances for building height, parking area setback, parking stall size, and number of parking spaces was arbitrary.

## COUNT FOUR

212.    Paragraphs 1 through 211 are incorporated by reference as if set forth fully herein.

30

213.     Plaintiff submitted sufficient proofs to justify the grant of all variances required by *N.J.S.A.* 40:55D-70 for Plaintiff's application.

214.     Plaintiff satisfied the positive and negative criteria for all the variances it required.

215.     Plaintiff satisfied the requirements for any design exceptions required for the site

plan.

216.     Plaintiff demonstrated that the Property could be developed in a safe and efficient manner in accordance with the requirements of the City Site Plan ordinance.

217.     The ZBA had no credible basis to deny the Application.

218.     The ZBA's denial of the Application was arbitrary, capricious, and unreasonable.

## COUNT FIVE

**Religious Land Use and Institutionalized Persons Act of 2000**
**"Nondiscrimination"**
**42 U.S.C. § 2000cc(b)(2)**

219.     Paragraphs 1 through 218 are incorporated by reference as if set forth fully herein.

220.     Defendants have deprived and have continued to deprive the Plaintiff of its right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations both on their face and as applied in a manner that discriminates against it on the basis of religion and religious denomination.

## COUNT SIX

**Violation of Religious Land Use and Institutionalized Persons Act of 2000**
**"Equal terms"**
**42 U.S.C. § 2000cc(b)(1)**

221.    Paragraphs 1 through 220 are incorporated by reference as if fully set forth herein.

222.    Defendants have deprived and continue to deprive the Plaintiff of its right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations both on their face and as applied in a manner that treats religious land uses on terms that are less than equal to nonreligious assembly and institutional land uses.

**COUNT SEVEN**

**Religious Land Use and Institutionalized Persons Act of 2000**
**"Substantial Burden"**
**42 U.S.C. § 2000cc(a)**

223.    Paragraphs 1 through 222 are incorporated by reference as if set forth fully herein.

224.    Defendants have deprived and continue to deprive the Plaintiff of its right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations both on their face and as applied in a manner that substantially burdens Plaintiff's religious exercise without using the least restrictive means of achieving a compelling governmental interest.

**COUNT EIGHT**

**Violation of Religious Land Use and Institutionalized Persons Act of 2000**
**"Total Exclusion"**
**42 U.S.C. § 2000cc(b)(3)(A)**

225.    Paragraphs 1 through 224 are incorporated by reference as if set forth fully herein.

226.    Defendants have deprived and continue to deprive the Plaintiff of its right to the free exercise of religion, as secured by RLUIPA, by implementing land use regulations both on

their face and as applied to Plaintiff in a manner that totally excludes religious assemblies, institutions, and structures within their jurisdiction.

## COUNT NINE

### Violation of Religious Land Use and Institutionalized Persons Act of 2000
### "Unreasonable Limitation"
### 42 U.S.C. § 2000cc(b)(3)(B)

227.     Paragraphs 1 through 226 are incorporated by reference as if set forth fully herein.

228.     Defendants have deprived and continue to deprive the Plaintiff of its right to the free exercise of religion, as secured by RLUIPA, by implementing land use regulations both on their face and as applied to Plaintiff in a manner that unreasonably limits religious assemblies, institutions, and structures within their jurisdiction.

## COUNT TEN

### United States Constitution, First Amendment
### 42 U.S.C. § 1983
### Free Exercise of Religion

229.     Paragraphs 1 through 228 are incorporated by reference as if set forth fully herein.

230.     Defendants has deprived and continue to deprive the Plaintiff of its right to free exercise of religion, as secured by the First Amendment to the United States Constitution and made applicable to the States by the Fourteenth Amendment, by burdening its religious exercise without using the least restrictive means of achieving a compelling governmental interest, and by discriminating against it on the basis of religion in a manner that is not the least restrictive means of achieving a compelling governmental interest.

## COUNT ELEVEN

### United States Constitution, Fourteenth Amendment

**42 U.S.C. § 1983**
**Equal Protection**

231.     Paragraphs 1 through 230 are incorporated by reference as if set forth fully herein.

232.     Defendants have deprived and continue to deprive the Plaintiff of its right to equal protection of the laws, as secured by the Fourteenth Amendment to the United States Constitution, by discriminating against it in the implementation of their land use regulations.

**COUNT TWELVE**

**New Jersey Law Against Discrimination**
**N.J. Stat. Ann. § 10:5-12.5**

233.     Paragraphs 1 through 232 are incorporated by reference as if set forth fully herein.

234.     N.J.S.A. 10:5-12.5 makes it unlawful for a municipality or an officer, employee, or agent thereof, to exercise its power to regulate land use or housing in a manner that discriminates on the basis of creed.

235.     Defendants have exercised their power to regulate land use in a discriminatory manner by the passage and enforcement of its land use ordinances.

236.     The unlawful discriminatory actions by Defendants do not serve any legitimate, non-discriminatory purpose.

237.     Defendants' conduct has caused significant damage to Plaintiff.

238.     Defendants are liable for the damage caused to Plaintiff and should be enjoined from further violating Plaintiff's rights.

**PRAYER FOR RELIEF**

**WHEREFORE**, the Plaintiff respectfully requests that this Court grant the

34

following relief:

1.  A declaration that the ZBA's decision is void, invalid and unconstitutional on the ground that it violates the Free Exercise Clause of the First Amendment to the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, the Religious Land Use and Institutionalized Persons Act and the New Jersey Law Against Discrimination;

2.  An order reversing the decision of the ZBA and granting the 2022 Application;

3.  An order directing the ZBA to grant the 2022 Application;

4.  Preliminary and permanent orders enjoining the Defendants, their officers, employees, agents, successors and all others acting in concert with them from applying their laws in a manner that violates the Free Exercise Clause of the First Amendment to the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and the Religious Land Use and Institutionalized Persons Act, or undertaking any and all action in furtherance of these acts;

5.  An award of compensatory damages against Defendants in favor of the Plaintiff as the Court deems just for the loss of their rights under the First and Fourteenth Amendments to the United States Constitution, the Religious Land Use and Institutionalized Persons Act and the New Jersey Law Against Discrimination incurred by the Plaintiff and caused by the Defendants' laws and actions;

6.  An award to the Plaintiff of full costs and attorneys' fees arising out of Defendants' actions and land use decisions and out of this litigation; and

7.  Such other and further relief as this Court may deem just and appropriate.

Dated: September 14, 2023

**BEATTIE PADOVANO, LLC**

*/s/ Ira E. Weiner*
Ira E. Weiner, Esq. (015791976)
Daniel L. Steinhagen, Esq.
200 Market Street, Suite 401
Montvale, New Jersey 07645
Tel: (201) 573-1810

**STORZER & ASSOCIATES, P.C.**

*/s/ Sieglinde K. Rath*
Sieglinde K. Rath, Esq. (048131991)
9433 Common Brook Road,
Suite 208
Owings Mills, Maryland 21117
Tel: 202.857.9766
Fax: 202.315.3996

*Counsel for Plaintiff*

## JURY DEMAND

Plaintiff hereby demands a trial by jury as to all issues to which a jury is permitted.


Dated: September 14, 2023

                                              **BEATTIE PADOVANO, LLC**

*/s/ Ira E. Weiner*
Ira E. Weiner, Esq. (015791976)
Daniel L. Steinhagen, Esq.
200 Market Street, Suite 401
Montvale, New Jersey 07645
Tel: (201) 573-1810


**STORZER & ASSOCIATES, P.C.**

*/s/ Sieglinde K. Rath*
Sieglinde K. Rath, Esq. (048131991)
9433 Common Brook Road,
Suite 208
Owings Mills, Maryland 21117
Tel: 202.857.9766
Fax: 202.315.3996

*Counsel for Plaintiff*

## <u>CERTIFICATION PURSUANT TO NEW JERSEY COURT RULES</u>

I, Ira E. Weiner, an attorney at law of the State of New Jersey, hereby certify:

1.     I am a member of the law firm of Beattie Padovano, LLC, and counsel for the Plaintiff herein.

2.     Pursuant to <u>Rule</u> 4:25-4, I am designated trial counsel for this matter.

3.     Pursuant to <u>Rule</u> 4:5-1, to the best of my knowledge, the matter in controversy is not the subject of any other action that is pending in any other court, or of a pending arbitration proceeding, nor is it the subject of any other action or proceeding contemplated by the Plaintiff.

4.     Pursuant to <u>Rule</u> 4:29-1(b), to the best of my knowledge, information and belief, there are no other parties who should be joined herein.

5.     Pursuant to <u>Rule</u> 1:38-7(b), all confidential personal identifiers have been redacted from documents now submitted to the court and will be redacted from all documents submitted in the future.

6.     Pursuant to <u>Rule</u> 4:69-4, to the extent required, all necessary transcripts of the proceedings relevant to this action are either in my possession or have been ordered.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

**BEATTIE PADOVANO, LLC**
Attorneys for Plaintiff,
Passaic-Clifton Community Kollel
Congregation


By: */s/ Ira E. Weiner*
    IRA E. WEINER


Dated: September 14, 2023

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that on this day, I caused copies of the Amended Complaint to be filed

with the Clerk of this Court on September 14, 2023 to:

    John D. Pogorelec, Esq.
    Marshall Dennehey Warner Coleman & Goggin
    840 Van Houten Avenue
    Clifton, NJ 07013

    *Attorney for Defendant, City of Clifton Zoning Board of Adjustment*


I certify that the forgoing statements made by me are true. I am aware that if any of the

forgoing statements made by me are willfully false, I am subject to punishment.


                    **STORZER & ASSOCIATES, P.C.**
                    Attorneys for Plaintiff
                    Passaic-Clifton Community Kollel Congregation


Dated: September 14, 2023          */s/ Sieglinde K. Rath*
                    Sieglinde K. Rath